## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 31 2018, 10:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Glen E. Koch II
Boren, Oliver & Coffey, LLP
Martinsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Evan M. Comer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of A.G. (Child) and J.B. (Father); | January 31, 2018 |
| J.B. (Father), | Court of Appeals Case No. 55A01-1710-JT-2323 |
| *Appellant-Respondent,* | Appeal from the Morgan Circuit Court |
| v. | The Honorable Matthew G. Hanson, Judge |
| The Indiana Department of Child Services, | Trial Court Cause No. 55C01-1611-JT-492 |
| *Appellee-Petitioner* | |

**May, Judge.**

[1] J.B. ("Father")[1] appeals the involuntary termination of his parental rights to A.G. ("Child"). Father argues the trial court's findings do not support its judgment that the conditions under which Child was removed from his care would not be remedied.[2] We affirm.

# Facts and Procedural History

[2] Child was born to As.G. ("Mother")[3] on March 22, 2005. On September 24, 2015, the Department of Child Services ("DCS") received a report of neglect of Child while in Mother's care. Upon investigation, DCS discovered Child suffered from rectal bleeding, and Mother had not taken him to a scheduled colonoscopy, a required part of his treatment for Gardner syndrome, a chronic disorder involving the gastro-intestinal tract. Child also had a high fever and was unresponsive. Child was taken to the hospital, where another illness was diagnosed via lumbar puncture and his colonoscopy was rescheduled.

[3] DCS located Father sometime after the September 24, 2015, report. Father indicated he suffered from a traumatic brain injury ("TBI"), was under the care

---

[1] Mother voluntarily relinquished her parental rights to Child and does not participate in this appeal.

[2] Father also asserts the evidence was insufficient to support the court's conclusion the continuation of the parent-child relationships posed a threat to Child's well-being. We need not, however, address that argument. *See infra* n. 5.

[3] Father did not have a relationship with Child until DCS contacted him as part of these proceedings. Until that time, Child thought another man was his father.

of a guardian, and did not have a suitable home for Child. For these and other reasons, Child was not placed with Father. Child remained in Mother's care.

[4] On October 1, 2015, DCS removed Child from Mother's care after Mother's boyfriend reportedly picked up Child by the neck and threw him across the room. Mother's boyfriend then demanded Mother and Child leave the home. Mother was unable to procure a stable living environment thereafter. Additionally, DCS had received reports Child had been sexually abused while in Mother's care. Child was placed with Paternal Aunt, who was also Father's guardian.

[5] On October 24, 2015, Child was removed from Paternal Aunt's care after he acted out sexually toward one of Paternal Aunt's children. Child was placed in kinship placement with "a family [Child] considers his grandparents." (DCS Ex. 1 at 6.) Child remained in kinship placement for the pendency of the proceedings. On October 27, 2015, DCS filed a petition alleging Child was a Child in Need of Services ("CHINS") based on neglect, physical abuse, and sexual abuse while in Mother's care, and Father's inability to care for Child.

[6] On November 5, 2015, the trial court held a hearing on the CHINS petition. Mother and Father admitted Child was a CHINS. The trial court held a dispositional hearing on December 2, 2015. The trial court ordered Father to engage in home-based services, visit with Child, allow inspections of his home, complete mental health and parenting assessments and follow all recommendations, and submit to random drug screening.

Father visited with Child on a regular basis, and DCS reported Child seemed to enjoy visits, despite Child's early reluctance to visit Father because he "had no prior relationship with [Father] and believed another man to be his father." (App. Vol. II at 14.)[4]   However, at some point during the CHINS case, the visits between Father and Child were changed to therapeutic visits due to Child and Father's "strained relationship." (*Id*. at 15.)  DCS reported while Father attended the majority of the scheduled visits, a few were missed "due to [Father] oversleeping or not responding to providers to confirm he would be attending." (*Id*.)

Father participated in services; however, the Court Appointed Special Advocate ("CASA") reported "due to [Father's] brain injury he could not properly care for [Child] full time." (*Id*.)  At some point during the CHINS proceedings, Father obtained a microwave to assist in meal preparation, but "still had transportation issues and needed a larger place before he could have [Child] live with him." (*Id*. at 14.)  The CASA indicated in her September 13, 2016, report "that [Father] still was unable to care for [Child] financially or otherwise and he had not completed therapy." (*Id*. at 16.)

On November 18, 2016, DCS filed a petition to terminate Father's parental rights.  The trial court held status hearings on the matter in early 2017, and on March 30, 2017, granted a continuance of the termination hearing because

---

[4] We commend the trial court on its well-detailed order on this matter.  The extensive and specific findings have aided our review.

"there was a possibility of post-adoption consents being filed." (*Id.* at 19.)
Those negotiations broke down. Father indicated he would not consent to
termination and would pursue custody of Child. The trial court held a
termination hearing on August 31, 2017, and issued an order terminating
Father's parental rights to Child on September 3, 2017.

# Discussion and Decision

[10]    We review termination of parental rights with great deference. *In re K.S., D.S.,
& B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh
evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind.
Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and
reasonable inferences most favorable to the judgment. *Id.* In deference to the
juvenile court's unique position to assess the evidence, we will set aside a
judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*,
717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied*
534 U.S. 1161 (2002).

[11]    "The traditional right of parents to establish a home and raise their children is
protected by the Fourteenth Amendment of the United States Constitution." *In
re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A trial court must
subordinate the interests of the parents to those of the children, however, when
evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d
at 837. The right to raise one's own children should not be terminated solely
because there is a better home available for the children, *id.*, but parental rights

may be terminated when a parent is unable or unwilling to meet parental responsibilities. *Id.* at 836.

[12] To terminate a parent-child relationship, the State must allege and prove:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

[13] When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of*

*Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[14]  Father challenges the court's conclusions the conditions under which Child was removed would not be remedied and the continuation of the parent-child relationship posed a risk to the well-being of Child. Father does not challenge any specific findings of fact, and therefore we accept the trial court's findings as true. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct."). Thus, we move to the second part of the analysis - whether the findings support the trial court's judgment.

[15]  The trial court must judge a parent's fitness to care for the child at the time of the termination hearing. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). Evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the requisite reasonable probability" that the conditions will not change. *Lang v. Starke Cnty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[16]  When assessing a parent's fitness to care for a child, the trial court should view the parents as of the time of the termination hearing and take into account the

changes that have occurred during the proceedings. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. However, the trial court must also "evaluat[e] the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of [a] child." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*.

[17] The trial court found, regarding whether the conditions concerning Father which resulted in Child's removal would be remedied:

> 152. That at the start of this case, [Father] was not an option for placement as he had no room for [Child] in his efficiency apartment, had no relationship with [Child], was unable to work, had his own guardian to care for him and was unable to provide transportation.
>
> \* \* \* \* \*
>
> 157. That [Child] has stated on multiple occasions that [Father] is "not my dad" and that he had "never been my dad."
>
> 158. That [Child] believed another man was his father for a good amount of time and apparently established a bond with that man.
>
> 159. That the provider discerned [Child] would have difficulties were he to be placed in the care of [Father].
>
> 160. That the DCS reported that since the start of this case they had tried to simplify and tailor the tasks for [Father].
>
> 161. That [Father] has done a good job of visiting with [Child] for most of the duration of this case.

162. That more recently [Father] has not been conducting visits, but seemed to lay blame on the DCS rather than on his non-response to calls.

163. That the CASA reiterated this issue with contacting both [Father] and [Father's] guardian in recent months.

164. That DCS presented testimony of their ongoing concerns which look exactly the same as the concerns when the case started.

165. Initially, [Father] requires a guardian himself for basically most of his needs.

166. That DCS notes [Child] has many mental health issues from the trauma in his life as well as some medical needs that arose during the start of this case.

167. That [Father] is not able to drive due to his TBI.

168. That [Father] has missed visits due to oversleeping in recent history and in the past, has insisted he could not do visits because of lack of funds and that he could not do visits due to not having clean clothes.

169. That there are concerns of the sexual acting out of [Child] against [Father's] guardian's own children and it seems logical that [Father] may not be able to protect [Child] from future allegations nor protect others from the acts of [Child] since he has difficulty handling his own affairs.

170. Likewise, and hand in hand with the sexual acting out, there are substantial mental health issues with [Child] that [Father] would have a hard time handling and/or identifying.

171. That while [Father] has visited with [Child] during this case, it is clear there is almost no bond.

172. That [Father], in past reports, indicated he tried to establish a bond with [Child] prior to the DCS case, but [Mother] prevented him from doing this.

173. That the court is not convinced, nor was there any evidence that [Father] did anything more than make a few feeble attempts to see [Child] when [Child] was young.

174. That this court is well aware that [Father] has a guardian, and it was clearly possible for that guardian or any court to aid [Father] in seeing [Child] if he/the guardian had truly taken the steps to see [Child].

175. That in other words, [Father] has simply sat back for a great portion of [Child's] life and accepted [Mother's] restricting his access.

176. This inability to find a way to [Child] and/or develop a relationship concerns this court even to this day as it is evidence he is unable to see how to go about even the simple tasks in life, and questions whether he could identify/handle more difficult tasks.

177. That the DCS and CASA both identify that we are no closer to solving the issues with [Father] today than we were on the day this case was filed.

178. That Father has remained in his efficiency, has not found continuous work, has limited funds to even visit with [Child], is unable to form a bond due to being absent from most of [Child's]

> life and has not simply moved forward in any manner showing this court he can care for [Child] that has many needs.

(App. Vol. II at 22-4.) Based thereon, the trial court concluded the conditions under which Child was removed would not be remedied.

[18] Father argues DCS did not present sufficient evidence of "[F]ather's diagnosis, prognoses, course of treatment, and likelihood of recovery." (Br. of Appellant at 8.) He cites case law to support his premise that his parental rights cannot be terminated based solely on his mental disability. *See Egly v. Blackford Cty. Dept. of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992) (mental disability, standing alone, is not proper ground for terminating parental rights). However, his argument ignores the plethora of additional findings to support the termination of his parental rights, including his lack of bond with Child, inappropriate housing, lack of employment, and failure to benefit from services. His argument is essentially a request for us to reweigh the evidence, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court does not reweigh evidence or judge the credibility of witnesses). The trial court's findings support its conclusion that the conditions under which Child was removed would not be remedied.[5] *See, e.g., Egly*, 592 N.E.2d at 1234 (findings regarding parents' lack

---

[5] The trial court found the conditions under which Child were removed would not be remedied and the continuation of the parent-child relationship posed a risk to the well-being of the Child. DCS does not have to prove both because the statute is written in the disjunctive, such that DCS must prove either by clear and convincing evidence. *See* Ind. Code § 31-35-2-4(b)(2)(B). Because the findings support the conclusion there was a reasonable probability conditions leading to Child's removal would not be remedied, we need not address whether the findings also support a conclusion that the continuation of the parent-child relationship

of improvement with conditions which existed at the time of children's removal, coupled with evidence of their mental disability, supported trial court's conclusion the conditions under which children were removed from parents' care would not be remedied). We therefore affirm the judgment of the trial court.

# Conclusion

[19] The trial court's unchallenged findings supported its conclusion that the conditions under which Child was removed would not be remedied. Accordingly, we affirm the termination of the Father's parental rights to child.

[20] Affirmed.

Vaidik, C.J., and Altice, J., concur.

---

posed a threat to Child's well-being. *See In re L.S.* 717 N.E.2d at 209 (because statute is written in the disjunctive, court needs to find only one requirement to terminate parental rights).